UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>  Plaintiff,<br> v.<br>JAIRO GARCIA,<br>  Defendant. | Case No. 18-cr-00617-EMC-1<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**<br><br>Docket No. 16 |

Defendant Jairo Garcia moves to dismiss his single-count indictment for illegal reentry following removal in violation of 8 U.S.C. § 1326. Docket No. 16 ("Mot."). Mr. Garcia's principal argument for dismissal is that the purported Notices to Appear ("NTAs") triggering his removal proceedings in 2001, 2005, and 2006 were invalid because they did not state the date, time, and place of the proceedings. Mr. Garcia contends that because the NTAs were deficient, the immigration court did not have jurisdiction to order his removal, and therefore his prior removals cannot support the illegal reentry charge against him. Mr. Garcia also argues that the expedited removal order he received in 2006 is invalid because the underlying proceedings did not comport with due process requirements.

For the reasons discussed below, Mr. Garcia's 2005 removal order may have been invalid for lack of notice of his removal hearing. However, he has not met his burden of establishing that his 2001 removal order and 2006 expedited removal order were invalid. Accordingly, his motion to dismiss the indictment is **DENIED**.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Mr. Garcia, a citizen of Mexico, entered the United States without inspection in 1985, when he was a young child. *See* Docket No. 17 (Borden Decl.), Exh. B (Dec. 14, 2000 NTA). In

September 2000, when he was seventeen years old, he was convicted in the Superior Court of California of one count of assault with a deadly weapon in violation of California Penal Code § 245(a)(1), for which he was sentenced to 180 days imprisonment. *See id.*, Exhs. A, B.

After Mr. Garcia completed his sentence, he was served with an NTA on December 14, 2000 informing him that the Government was initiating removal proceedings against him. *Id.*, Exh. B. The NTA did not list the date, time, or location for the removal hearing. *See id.* However, immigration authorities sent Mr. Garcia two separate follow-up notices regarding his removal hearing, known as Notices of Hearing. The first, dated February 14, 2001, gave notice of a removal hearing in Eloy, Arizona on February 28, 2001. Docket No. 26 (Blank Decl.), Exh. A at Bates JFG-00115. That hearing was continued. The second notice is dated February 28, 2001, and appears to give notice of a removal hearing in Eloy on March 21, 2001.[1] *See id.* at Bates JFG-00114. On March 21, 2001, Mr. Garcia was ordered removed by an Immigration Judge ("IJ") after a group removal hearing. *See* Borden Decl., Exh. L (Audio Recording of Hearing) at Part 2, 1:41–4:57. He was removed to Mexico on the same day.

On June 3, 2002, Mr. Garcia was served with a Notice of Intent/Decision to Reinstate Prior Order. *See id.*, Exh. E. His March 21, 2001 removal order was reinstated and he was removed the next day. *See id.*, Exh. F (Warrant of Removal).

On October 17, 2005, Mr. Garcia was served with a second NTA. The NTA did not list the date, time, or location for his removal hearing. *See id.*, Exh. G. On October 18, 2005, Mr. Garcia received a "Notice of Custody Redetermination Hearing," *i.e.*, a bond hearing, scheduled for the next morning. Blank Decl., Exh. A at Bates JFG-00079. At that hearing, however, Mr. Garcia was ordered removed. *See* Borden Decl., Exh. M (Audio Recording of Hearing). At the hearing, an individual identifying himself as "Mr. Ricci" spoke on Mr. Garcia's behalf, although it is not clear whether he was Mr. Garcia's attorney. *See id.* at 0:36–0:54. Mr. Garcia was removed to Mexico two days later. *See id.*, Exh. H (Warrant of Removal).

Mr. Garcia received two removal orders in 2006. The first was a regular removal order,

---

[1] The copy of the second Notice of Hearing in the record is quite faint, and some of its contents are difficult to discern.

2

stemming from an April 7, 2006 NTA. As with his two previous NTAs, this one did not list the date, time, or location for the removal hearing. *See id.*, Exh. I. On May 5, 2006, Mr. Garcia was ordered removed after a group removal hearing. *See id.*, Exh. N (Audio Recording of Hearing) at 3:35–4:52. He was removed to Mexico on May 9, 2006. *See id.*, Exh. J (Warrant of Removal).

Mr. Garcia then returned to the United States. A second, "expedited removal" proceeding under 8 U.S.C. § 1225(b)(1) then occurred. *See id.*, Exh. K (May 15, 2006 Notice and Order of Expedited Removal). The expedited removal order stated that he had sought admission to the United States at the San Ysidro Port of Entry and declared himself to be a United State Citizen. *See id.* On May 15, 2006, he was ordered removed. *See id.*

Mr. Garcia was indicted with the instant charge of illegal reentry in violation of 8 U.S.C. § 1326 on December 20, 2018. *See* Docket No. 1 (Indictment). The indictment charged that he was found in the United States on or about December 4, 2018, after having previously being removed on March 21, 2001, June 4, 2002, October 21, 2005, May 9, 2006, and May 15, 2006. *See id.* The charge is predicated on the validity of those removals.

## II.　LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12(b)(3)(B)(v), a defendant may move to dismiss an indictment on the ground that the indictment "fail[s] to state an offense." In considering a motion to dismiss an indictment, a court must accept the allegations in the indictment as true and "analyz[e] whether a cognizable offense has been charged." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). "In ruling on a pre-trial motion to dismiss an indictment for failure to state an offense, the district court is bound by the four corners of the indictment." *Id.*

Mr. Garcia argues that his prior removals were invalid because of lack of proper notice. To establish that a prior removal cannot serve as the basis of an indictment for illegal reentry, 8 U.S.C. § 1326(d) requires a defendant to "demonstrate that (1) he exhausted the administrative remedies available for seeking relief from the predicate removal order; (2) the deportation proceedings 'improperly deprived [him] of the opportunity for judicial review'; and (3) the removal order was 'fundamentally unfair.'" *United States v. Raya-Vaca*, 771 F.3d 1195, 1201

(9th Cir. 2014) (quoting § 1326(d)).

### III. DISCUSSION

A. *Pereira* and *Karingithi*

Two recent decisions are relevant to Mr. Garcia's motion. In the first, *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), the Supreme Court held that an NTA that fails to specify the time or place of the removal proceedings does not trigger the "stop-time" rule.[2] *Id.* at 2110. The Court explained that this conclusion was compelled by the statutory text in the Immigration and Nationality Act:

> Under the stop-time rule, "any period of ... continuous physical presence" is "deemed to end ... when the alien is served a notice to appear under section 1229(a)." 8 U.S.C. § 1229b(d)(1). By expressly referencing § 1229(a), the statute specifies where to look to find out what "notice to appear" means. Section 1229(a), in turn, clarifies that the type of notice "referred to as a 'notice to appear'" throughout the statutory section is a "written notice ... specifying," as relevant here, "[t]he time and place at which the [removal] proceedings will be held." § 1229(a)(1)(G)(i). Thus, based on the plain text of the statute, it is clear that to trigger the stop-time rule, the Government must serve a notice to appear that, at the very least, "specif[ies]" the "time and place" of the removal proceedings.

*Pereira*, 138 S. Ct. at 2114. Despite its broad language which seemingly transcends the context of the "stop-time" rule, *Pereira* did not address the specific question whether an NTA without time and place information is insufficient to vest an immigration court with jurisdiction to conduct removal proceedings.

Subsequently, the Ninth Circuit in *Karingithi v. Whitaker*, 913 F.3d 1158 (9th Cir. 2019) held that *Pereira*'s holding is confined to the narrow context of the stop-time rule. The petitioner in *Karingithi* was a Kenyan citizen who was ordered removed after receiving an NTA that did not specify the time and place of her removal hearing. *Id.* at 1159–60. She argued on appeal that "if a notice to appear does not state the time for her initial removal hearing, it is not only defective

---

[2] Under the Immigration and Nationality Act, "[n]onpermanent residents ... who are subject to removal proceedings and have accrued 10 years of continuous physical presence in the United States, may be eligible for a form of discretionary relief known as cancellation of removal." *Pereira*, 138 S. Ct. at 2109 (citing 8 U.S.C. § 1229b(b)(1)). The "stop-time" rule defines when the period of "continuous physical presence in the United States" is deemed to end. *Id.* at 2110.

4

under § 1229(a)" in light of *Pereira*, "but also does not vest jurisdiction with the IJ." *Id.* at 1160–61. The Ninth Circuit disagreed. It observed that two different provisions, one statutory and one regulatory, listed requirements for the contents of an NTA. *Id.* at 1160. The statutory provision that was the basis of *Pereira*'s holding, 8 U.S.C. § 1229(a), "requires, without qualification, inclusion of '[t]he time and place at which the proceedings will be held.'" *Id.* (quoting 8 U.S.C. § 1229(a)(1)(G)(i)). The regulatory provision, in contrast, only requires the time and date information to be included in an initial NTA "where practicable." 8 C.F.R. § 1003.18(b); *see also* 8 C.F.R. § 1003.15(b). "When 'that information is not contained in the Notice to Appear,' the regulation requires the IJ to 'schedul[e] the initial removal hearing and provid[e] notice to the government and the alien of the time, place, and date of hearing'" through a Notice of Hearing. *Karingithi*, 913 F.3d at 1160 (quoting 8 C.F.R. § 1003.18(b) (alterations in original)).

The Ninth Circuit decided that "[t]he regulatory definition, not the one set forth in § 1229(a), governs the Immigration Court's jurisdiction" over removal proceedings. *Id.* It reasoned that the regulation, entitled "Jurisdiction and commencement of proceedings," specifically addresses when an Immigration Court's "[j]urisdiction vests," *id.* at 1159 (quoting 8 C.F.R. § 1003.14(a)), whereas "[s]ection 1229 says nothing about the Immigration Court's jurisdiction," *id.* at 1160. The court also cited a recent precedential decision from the Board of Immigration Appeals ("BIA") rejecting the same jurisdictional argument raised by the *Karingithi* petitioner. *Id.* at 1161. That decision, *Matter of Bermudez-Cota*, 27 I. & N. Dec. 441 (BIA 2018), was due "substantial deference" because the BIA's interpretation of its regulations therein "sensibly conforms to the purpose and wording of the regulations." *Karingithi*, 913 F.3d at 1161 (quoting *Lezama-Garcia v. Holder*, 666 F.3d 518, 525 (9th Cir. 2011)).

Noting that the *Karingithi* petitioner had received a follow-up Notice of Hearing specifying the time and date of her removal hearing after the initial, deficient NTA, the Ninth Circuit concluded that the Immigration Court had jurisdiction over her proceedings. *Id.* at 1162. However, the court noted that it was "not decid[ing] whether jurisdiction would have vested if she had not received this information in a timely fashion." *Id.*

5

B.   Analysis

To prevail on his motion, Mr. Garcia must establish that his removal orders from NTAs in 2001, 2005, and 2006 and his expedited removal order from 2006 were all invalid under 8 U.S.C. § 1326(d). (The parties agree that the validity of the 2002 reinstatement of Mr. Garcia's 2001 removal order hinges on the validity of the predicate 2001 removal order.)

1.   The 2001, 2005, and 2006 Removal Orders

Mr. Garcia's opening brief relies on *Pereira* to argue that the Immigration Court lacked jurisdiction over his removal proceedings because all three of his NTAs lacked the time and place information required by 8 U.S.C. § 1229(a), rendering the three resulting removal orders invalid. *See* Mot. at 5–13. Recognizing that *Karingithi* held a deficient NTA does not necessarily deprive the Immigration Court of jurisdiction, Mr. Garcia attempted to dismiss *Karingithi* as "neither controlling nor precedential" because its reasoning was flawed. *See id.* at 14–27. These efforts are unavailing because "[o]nce a [Ninth Circuit] panel resolves an issue in a precedential opinion, the matter is deemed resolved, unless overruled by the court itself sitting en banc, or by the Supreme Court." *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001). "A district judge may not . . . disagree with his learned colleagues on his own court of appeals who have ruled on a controlling legal issue." *Id.* at 1170.

Mr. Garcia's reply brief changes tack. Instead of trying to show that *Karingithi* is not binding, he now argues that it is distinguishable. According to Mr. Garcia, "*Karingithi* is inapposite to Mr. Garcia's motion because he never received a timely and proper Notice of Hearing like the one that the Ninth Circuit determined in *Karingithi* can cure date-time-and-place deficiencies in a Notice to Appear." Docket No. 25 ("Reply") at 1. This argument raises two questions. The first is the question left open in *Karingithi*—as a matter of law, is a timely Notice of Hearing required to vest the Immigration Court with jurisdiction over the removal proceedings where the initial NTA was defective? *See* 913 F.3d at 1162. Second, if such a Notice of Hearing is required, did Mr. Garcia ever received such a Notice of Hearing as a matter of fact?

As noted above, the Ninth Circuit expressly left the first question open in *Karingithi*. 913 F.3d at 1162. Some courts have subsequently suggested that a curative Notice of Hearing is

6

required to vest jurisdiction in an Immigration Court if the initial NTA was deficient. *See, e.g.*, *Hernandez-Perez v. Whitaker*, 911 F.3d 305, 314–15 (6th Cir. 2018) ("[J]urisdiction vests with the immigration court where, as here, the mandatory information about the time of the hearing . . . is provided in a Notice of Hearing issued after the NTA."); *Bermudez-Cota*, 27 I. & N. Dec. at 447 ("[A] notice to appear that does not specify the time and place of an alien's initial removal hearing vests an Immigration Judge with jurisdiction over the removal proceedings . . . so long as a notice of hearing specifying this information is later sent to the alien."); *United States v. Morales-Santiago*, No. 2:18-CR-120-RMP, -- F. Supp. 3d ---, 2019 WL 1317719, at *5–6 (E.D. Wash. Mar. 22, 2019) ("Without a properly-served Notice of Hearing, the immigration court never had jurisdiction over Defendant's removal proceedings."). Other courts have reached the opposite conclusion. *See, e.g.*, *USA v. Arteaga-Centeno*, No. 18-CR-00332-CRB-1, 2019 WL 1995766, at *8 (N.D. Cal. May 6, 2019) ("[T]he conclusion . . . that jurisdiction can only vest when the Immigration Court later provides the noncitizen a Notice of Hearing with time and date information is unsupported by either the holding or reasoning of *Karingithi*.").

If a Notice of Hearing *is* required to vest the Immigration Court with jurisdiction, Mr. Garcia's removal orders in 2005 and 2006 would be invalid. It is undisputed that Mr. Garcia did not receive a Notice of Hearing to cure the deficient NTA in his 2006 proceedings. And the follow-up notice Mr. Garcia received after his NTA in 2005 was not a "Notice of Hearing"—it was a notice for a *bond* hearing, not a merits *removal* hearing. *See* Blank Decl., Exh. A at Bates JFG-00079; *Demore v. Kim*, 538 U.S. 510, 519 (2003) (explaining that an IJ conducts a bond hearing to determine whether a noncitizen should be released from immigration custody during the pendency of his or her removal proceedings). Moreover, Mr. Garcia received the notice for the bond hearing just one day in advance of the hearing. While the Government insists that this notice sufficed to put Mr. Garcia on notice of his removal hearing, the audio recording reveals that the proceedings began as a bond hearing and only transitioned to a discussion about removal after Mr. Garcia was told that no definitive decision on bond would be reached that day and that the bond question would have to be deferred to a subsequent hearing. *See* Borden Decl., Exh. M.

It is not necessary for the Court to resolve the question left open by *Karingithi* for the

7

purposes of this motion, because even if a Notice of Hearing is required to vest an Immigration Court with jurisdiction, the record indicates that Mr. Garcia received such a notice in 2001. The record contains two Notices of Hearing with specification of time and place in connection with his 2001 removal proceedings. *See* Blank Decl., Exh. A at Bates JFG-00114–115. Mr. Garcia contends, however, that there is no proof that he actually received either of the Notices of Hearing. Neither Notice of Hearing is signed by Mr. Garcia, but both notices indicate that they were delivered to Mr. Garcia's "Custodial Officer" at the Eloy Detention Center rather than Mr. Garcia himself. *See id.* Mr. Garcia submitted a declaration in which he averred: "I do not recall receiving any Notice of Hearing in Removal Proceedings while I was in custody in 2001, and I do not believe that I received any such notice." Docket No. 31 ¶ 2. But he did not go so far as to state that he did not in fact receive the notices.

To allow both parties to adduce more evidence regarding the circumstances of the 2001 removal proceedings, the Court held an evidentiary hearing on June 3, 2019. At the hearing, Mr. Garcia initially testified on direct examination that he had never seen the Notices of Hearing before, but on cross examination admitted that it is possible he saw them but simply had no recollection of them. He explained that while he was in immigration detention, he was presented with many papers pertaining to his case and was told to sign some of them. Mr. Garcia acknowledges that the Notices of Hearing may have been among the papers, but because he was not given an opportunity to fully review them at the time, he does not have a specific recollection of them now.[3]

In contrast to Mr. Garcia's equivocation, the Government produced evidence strongly suggesting that he received, at a minimum, the second Notice of Hearing. During the March 21, 2001 removal hearing at which Mr. Garcia appeared, the IJ confirmed that the hearing had been continued from the original date of February 28, 2001 because when Mr. Garcia appeared in court

---

[3] To the extent Mr. Garcia claimed that he was never shown the Notices of Hearing, the Court finds his testimony not credible. His statements about his recollection of his legal proceedings were marked by inconsistencies. Most notably, he claimed to have no memory of the declaration he had submitted in support of his motion to dismiss filed herein mere weeks before the evidentiary hearing—a declaration that he had signed in open court. His memory appears to be weak if not selective.

8

on February 28, he had asked for time to find legal representation. *See* Borden Decl., Exh. L at Part 2, 1:41–4:57. The second Notice of Hearing was issued on February 28, 2001—the same day Mr. Garcia requested the continuance. Blank Decl., Exh. A at Bates JFG-00114. It is likely that Mr. Garcia was given the new date for his removal hearing—March 21—when he requested the continuance on February 28. The issuance of the second notice of hearing on that same date of the first hearing in which the continuance was granted tends to corroborate that inference. Moreover, Officer Sarafino Talamantes, a staff member responsible for distributing mail at the Eloy Detention Center in 2001, testified that it was standard procedure for Eloy staff to deliver court notices directly to detained individuals on a daily basis, and thus his testimony, if accurate, would establish a likelihood that Mr. Garcia in fact received the second notice.[4] The Court finds Officer Talamantes credible on this point. Such Notice on February 28 of the March 21 hearing would have given Mr. Garcia sufficient notice of the final hearing.

In light of this evidence, Mr. Garcia has not met his burden under § 1326(d) to demonstrate that he did not receive any Notice of Hearing in connection with his 2001 removal proceedings. Accordingly, his 2001 removal order is valid and supports the challenged indictment.

2. The 2006 Expedited Removal Order

The Court separately finds that Mr. Garcia's 2006 expedited removal order is also valid. "An expedited removal proceeding under 8 U.S.C. § 1225 allows immigration officers to (1) determine whether certain aliens are inadmissible, and (2) enter removal orders, generally without hearing or further review." *United States v. Raya-Vaca*, 771 F.3d 1195, 1199 (9th Cir. 2014).

> During an expedited removal proceeding, an immigration officer must conduct an inspection and determine whether the alien is inadmissible because the alien (1) has made a material misrepresentation to gain admission into the United States, (2) has "falsely represent[ed]" himself to be a United States citizen, or (3) does not possess a "valid entry document." *See* 8 U.S.C. § 1225(a)(3), (b)(1)(A)(i); *see also id.* § 1182(a)(6)(C)(i), (a)(6)(c)(ii)(I), (a)(7)(A)(i). When making a finding of inadmissibility, the examining immigration officer must "create a

---

[4] Mr. Garcia's counsel attempted to introduce into evidence two reports documenting several complaints that individuals detained at Eloy Detention Center had filed regarding the facility's mail services. The complaints were relatively few in number and are not particularly probative as to whether Mr. Garcia received his court notices.

9

> record of the facts of the case and statements made by the alien." 8 C.F.R. § 235.3(b)(2)(i). The officer "shall ... have the alien read (or have read to him or her) the statement." *Id.* Moreover, the officer "shall advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges in the sworn statement." *Id.* Then, if the officer determines the alien to be inadmissible, "the officer shall order the alien removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum ... or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

*Id.* at 1199–200.

Mr. Garcia contends that his expedited removal violated due process because the immigration authorities failed to comply with certain procedural regulations. *See* Mot. at 28–30. As noted above, to show that a removal order cannot serve as a predicate for his indictment for illegal reentry, Mr. Garcia must demonstrate that (1) he exhausted the administrative remedies available for seeking relief from the predicate removal order; (2) the deportation proceedings "improperly deprived [him] of the opportunity for judicial review"; and (3) the removal order was "fundamentally unfair." 8 U.S.C. § 1326(d). In the context of expedited removal, the first two prongs are automatically established because "the statute governing expedited removal proceedings afforded [Mr. Garcia] no opportunity for administrative or judicial review." *Raya-Vaca*, 771 F.3d at 1202. Mr. Garcia therefore needs only to "establish that the removal order was fundamentally unfair," *i.e.*, that "the 'deportation proceeding violated his due process rights' and that the violation caused prejudice." *Id.* at 1201–02 (quoting *United States v. Leon-Leon*, 35 F.3d 1428, 1431 (9th Cir. 1994) (alterations omitted)).

### a. Due Process

Mr. Garcia asserts the due process violation tainting his proceedings arose from the Government's failure to comply with the "regulations governing expedited removal proceedings," which "codify, in mandatory terms, the immigration officer's duty to inform the alien of the charge against him and to allow the alien to review the sworn statement prepared in his name." *Id.* at 1204 (citing 8 C.F.R. § 235.3(b)(2)(i)). Specifically,

> the examining immigration officer shall create a record of the facts of the case and statements made by the alien. This shall be accomplished by means of a sworn statement using Form I–

> 867A[/]B.... The examining immigration officer shall read (or have read) to the alien all information contained on Form I–867A. Following questioning and recording of the alien's statement regarding identity, alienage, and inadmissibility, the examining immigration officer shall record the alien's response to the questions contained on Form I–867B, and have the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction. The examining immigration officer shall advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges in the sworn statement.

*Id.* at 1204 n.7 (citing 8 C.F.R. § 235.3(b)(2)(i)).

Mr. Garcia highlights two ways in which the Government failed to comply with § 235.3(b)(2)(i) in his proceedings. First, the Form 1-867B, which contains Mr. Garcia's signature, states: "I have read (or had read to me) this statement, consisting of 1 pages (including this page)." Docket No. 22 (Peng Decl.), Exh. G at Bates JFG-00260. But the combined Form I-867A/B actually contains three pages. *See id.* at Bates JFG-00258–260. Mr. Garcia correctly observes that the Ninth Circuit in *Raya-Vaca* identified this page-numbering inconsistency as evidence tending to show a due process violation, because it suggests that the noncitizen was not given the opportunity to review the statement in full. *Raya-Vaca*, 771 F.3d at 1205. However, unlike in *Raya-Vaca*, Mr. Garcia initialed the first two pages of Form I-867A/B, indicating that he did have the opportunity to review the forms in full. Mr. Garcia would have recognized that the text indicating the statement consisted of only one page was merely a typographical error. Accordingly, there appears to be no due process violation arising from the Form I-867A/B.

The second alleged defect is that the Form I-860 does not contain Mr. Garcia's signature. *See* Peng Decl., Exh. F at Bates JFG-00054–55. The Government does not dispute that the lack of a signature on Mr. Garcia's Form I-860 is a violation of 8 C.F.R. § 235.3(b)(2)(i), which requires the immigration officer to "serve the alien with Form I-860 and the alien shall sign the reverse of the form acknowledging receipt." Several district courts in this circuit have held that the absence of a signature on the reverse side of the Form I-860 amounts to a due process violation. *See, e.g.*, *United States v. Ramirez-Diaz*, 359 F. Supp. 3d 994, 998–99 (D. Or. 2019); *United States v. Mejia-Avila*, No. 2:14-CR-0177-WFN-1, 2016 WL 1423845, at *1 (E.D. Wash. Apr. 5, 2016). This Court is not convinced, however, that the failure to obtain a signature in compliance with

§ 235.3(b)(2)(i) amounts to a *per se* due process violation. In *Raya-Vaca*, the Ninth Circuit noted that "not every violation of a regulation rises to the level of a due process violation," and that due process fundamentally "requires, at a minimum, notice and an opportunity to respond." 771 F.3d at 1204 (citing *United States v. Caceres*, 440 U.S. 741, 751–52 (1979)). *Raya-Vaca* thus concluded that "any failure to inform [a noncitizen] of the charge against him and to provide him the opportunity to review the sworn statement constitute[s] a violation of [the noncitizen's] due process rights." *Id.* The question then is whether the noncitizen was so informed.

Here, the record evidence shows that Mr. Garcia was notified of the charges against him and was given an opportunity to review the Form I-860. Sergio Barron, the examining officer in Mr. Garcia's expedited removal proceedings in 2006, testified at the evidentiary hearing as to his regular practice in conducting expedited removal proceedings. He explained that after he interviewed the noncitizen in accordance with the Form I-867A/B, he would personally serve the Form I-860 on the noncitizen, whereupon he would sign the certification on the front of the Form I-860 that he had personally served it on the noncitizen. Barron also testified that it was his practice to explain the expedited removal procedures to the noncitizen and to alert him or her to the import of the statements he or she gave for the Form I-867A/B. The front of Mr. Garcia's Form I-860 contains a certification by Officer Barron that he had personally served the form on Mr. Garcia. *See* Peng Decl., Exh. F at Bates JFG-00054. Based on Mr. Barron's detailed testimony about his regular practices for serving the Form I-860, combined with his certification on Mr. Garcia's particular Form I-860, the Court concludes that Mr. Garcia has not met his burden of establishing that he was not notified of the expedited removal charge against him via the Form I-860 and that he was not given the opportunity to review the Form. He has thus failed to satisfy the first step of the "fundamentally unfair" inquiry under § 1326(d).

    b. <u>Prejudice</u>

Even if the Government's noncompliance with 8 C.F.R. § 235.3(b)(2)(i) amounted to a due process violation, in order to obtain relief from removal, Mr. Garcia would still be required under § 1326(d) to establish that "he suffered prejudice as a result of the entry of the [expedited removal] order." *Raya-Vaca*, 771 F.3d at 1206. To establish prejudice under § 1326(d), he "must show that

12

he had 'plausible grounds for relief' from the removal order." *Id.* (quoting *United States v. Jimenez-Marmolejo*, 104 F.3d 1083, 1085 (9th Cir. 1996)). As a noncitizen in expedited removal proceedings, Mr. Garcia was eligible for a form of discretionary relief termed "withdrawal of application for admission." *See* 8 U.S.C. § 1225(a)(4). "[A]n individual granted leave to withdraw his application for admission may exit the United States voluntarily and without a removal order." *Raya-Vaca*, 771 F.3d at 1206 (citing 8 C.F.R. § 1235.4). Thus, Mr. Garcia must show that it is plausible that he would have been granted leave to withdraw his application for admission in 2006. In this context, "plausible" means he "need only establish some evidentiary basis on which relief could have been granted." *Id.* at 1207 (explaining that a "theoretical possibility of relief" is insufficient, but the defendant "need not prove that relief was probable") (citations, internal quotation marks, and alterations omitted).

An immigration officer is instructed to "consider all facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice," including "six factors relevant to the question of relief: (1) the seriousness of the immigration violation; (2) previous findings of inadmissibility against the alien; (3) intent on the part of the alien to violate the law; (4) ability to easily overcome the ground of inadmissibility; (5) age or poor health of the alien; and (6) other humanitarian or public interest considerations." *Id.* (citations omitted). Finally, the agency field manual notes "that withdrawal should 'ordinarily' not be permitted 'in situations where there is obvious, deliberate fraud on the part of the applicant.'" *Id.*

The *Raya-Vaca* found that the noncitizen there would plausibly have been allowed to withdraw his application for admission, and Mr. Garcia asks this Court to make a similar finding here. But in *Raya-Vaca*, the primary factor the Ninth Circuit identified as supporting its plausibility finding was the fact that the noncitizen had committed no fraud. 771 F.3d at 1208 ("First and foremost, Raya-Vaca committed no fraud, let alone obvious or deliberate fraud, when entering the United States."). The court emphasized that this was "a crucial consideration . . . of singular importance." *Id.* In contrast, Mr. Garcia does not dispute that he falsely stated to immigration officials at the border that he was a U.S. citizen, and that he had no prior removals.

13

*See* Docket No. 21 at 20.  Indeed, he admitted at the evidentiary hearing that he had made these false statements deliberately in an attempt to gain admission.  Mr. Garcia's case thus presents circumstances more akin to those in *United States v. Barajas-Alvarado*, 655 F.3d 1077 (9th Cir. 2011).  In *Barajas-Alvarado*, the court observed that the petitioner "conceded that he had deliberately presented false documents to inspection officers in an effort to gain admission to the United States," and "that he has been subject to two [prior] expedited removal orders." *Id.* at 1090.  Those two factors led the court to conclude that it was not plausible that the petitioner would have been allowed to withdraw his application for admission.  Although the petitioner in *Barajas-Alvarado* produced statistical evidence of high grant rates for discretionary relief applications, had some ties to the United States, and had committed relatively minor prior crimes, those considerations were not enough to tip the scale in his favor. *Id.* at 1091.

Mr. Garcia's "obvious or deliberate fraud" in seeking admission and multiple prior removal orders weigh heavily against him in the plausibility determination.  In addition, although the offenses were not serious, Mr. Garcia had a 2000 juvenile conviction for felony assault and a 2002 misdemeanor conviction for simple drug possession on his record in 2006.  Reply at 9.  He does not suffer from age or poor health.  On balance, these factors establish he would not plausibly have been allowed to withdraw his application for admission.  Mr. Garcia has thus failed to show that he was prejudiced by the entry of the 2006 expedited removal order.  The removal order was not "fundamentally unfair."

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Mr. Garcia's 2001 removal order and 2006 expedited removal orders are valid and sufficient to serve as predicates for the illegal reentry charge he challenges.  Accordingly, Mr. Garcia's motion to dismiss the indictment is **DENIED**.

This order disposes of Docket No. 16.

**IT IS SO ORDERED**.

Dated: June 18, 2019

EDWARD M. CHEN
United States District Judge

14